**PITTWAY, Plaintiff,**

v.

**BLACK & DECKER, Defendant.**

No. 87 C 2188.

United States District Court,
N.D. Illinois, E.D.

July 23, 1987.

James M. Amend, P.C., Stanley A. Schlitter, David L. Witcoff, Kirkland & Ellis, Chicago, Ill., for plaintiff.

John A. Artz, Harness, Dickey & Pierce, Birmingham, Mich., William A. VanSanten, Wood, Dalton, Phillips, Mason & Rowe, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

PARSONS, Senior District Judge:

Plaintiff, Pittway Corporation, seeks a preliminary injunction restraining defendant Black & Decker (U.S.), Inc. from "manufacturing, selling or advertising or offering for sale" their new "Flashliter" rechargeable flashlights, and otherwise infringing U.S. Patent Letter No. 4,647,832. Plaintiff also states that defendant be enjoined from liquidating the remainder of its inventory of their allegedly infringing rechargeable flashlights.

Plaintiff designs, manufactures and distributes consumer and industrial products, including rechargeable flashlights in which the electrical force powering the flashlight can be recharged and reused, rather than replaced altogether (as in the case, for example, of disposable batteries). Pittway is the present owner of all right, title and interest in United States Patent No. 4,647,832 that was issued on March 3, 1987, covering a "Three Position Switch" for this portable rechargeable flashlight. The defendant also manufactures, distributes and sells consumer products, including rechargeable flashlights.

On March 3, 1987, Pittway filed a complaint charging Black & Decker with infringement of its patent. Then, on March 10, 1987, Pittway filed its motion for preliminary injunction.

### Background

Pittway first became involved with flashlights around 1981. It became interested in rechargeable flashlights at that time because few rechargeable flashlights were available, and they all were relatively expensive and had many problems. An example of these expensive, relatively crude rechargeable flashlights was one where the user had to physically remove the rechargeable unit from the flashlight, plug that unit into an electrical outlet for recharging, and then once it is recharged, insert that unit back into the flashlight. Other examples of the expensive, unrefined rechargeable flashlights available in 1981–82 include: (1) flashlights where the user could recharge them only by placing them into large, connecting racks or brackets which previously had been plugged into electrical outlets; (2) flashlights where the user had to unscrew one end of the flashlight to expose an electrical cord which then could be plugged into an outlet for recharging; and (3) flashlights which featured electrical prongs permanently sticking out of the flashlight body to be plugged directly into an electrical outlet. All of these early rechargeable flashlights were relatively expensive, cumbersome, inconvenient, sometimes space-consuming (the conductive racks or brackets) and sometimes unsafe and subject to damage (permanently extended electrical prongs).

Anticipating a great market potential, Pittway developed its First Alert Rechargeable Flashlight (RL 30 Model) which over-

came the disadvantages and problems of the prior rechargeable flashlights. The evidence shows that this new rechargeable flashlight is unique because it can be plugged directly into an electrical outlet for recharging, so that the user will not be required to unscrew or unhinge anything, or use any type of external device to recharge it. Pittway also recognized that the function selected by the user (i.e., "ON", "OFF", "RECHARGE") should be directly related to whether the electrical recharge prongs are needed. Its engineers went on to develop a unique three-position electrical control switch, which when it is moved to the "ON" or "OFF" position, the recharge prongs remained recessed in the flashlight handle and covered by the switch; and when the switch is moved to the "RECHARGE" position, the prongs are automatically rotated out of the handle until they are perpendicular to the flashlight body so that the flashlight can then simply be plugged into an electrical outlet for recharging. In addition, the switch and flashlight circuitry are designed so that recharging will occur without damaging the flashlight or energizing the flashlight bulb. Finally, after the flashlight is recharged and unplugged from the socket, sliding the switch back to the "ON" or "OFF" position will cause the prongs to retract fully into the flashlight handle and be covered by the switch once again.

To protect their investment in developing this product, and to help achieve its objective of becoming a market leader in rechargeable electrical devices, Pittway applied for a patent covering its unique three-position switch. The original application was filed on July 26, 1984. Thereafter, a continuation-in-part application covering the invention was filed on June 24, 1985. This application issued as U.S. Patent No. 4,647,832 on March 3, 1987.

Pittway's First Alert Rechargeable Flashlights were an immediate commercial success in the marketplace. Through the end of the first quarter of 1987, Pittway sold over 3,000,000 First Alert Rechargeable Flashlights for a gross revenue exceeding $30,000,000.

Black & Decker had been manufacturing rechargeable flashlights prior to the introduction of Pittway's First Alert Rechargeable Flashlight, but none of them could be directly plugged into an electrical outlet for recharging or had a switch which rotated the recharge prongs into and out of the flashlight body. In February of 1986, Black & Decker decided that it needed a product that would compete with Pittway's new innovation in the rechargeable flashlight market. Black & Decker employed Yamada Electric, an electrical appliance manufacturer in Japan, to start a "rapid development program" to manufacture rechargeable flashlights patterned after Pittway's First Alert Rechargeable Flashlight and sent samples of Pittway's model along to guide Yamada in the making of a Black & Decker product. The flashlight manufactured by Yamada for Black & Decker turned out to be almost identical to Pittway's new product except for the size and shape of the outer body and bulb. After this case was filed, Black & Decker admitted that they had patterned their product after Pittway's First Alert Rechargeable Flashlight, including the patented three-position switch, and that their product infringed upon Pittway's '832 patent.

After approving the final design of its new product, Black & Decker ordered 400,000 of their infringing "FlashLiter" on June 13, 1986, and when the hearing on the notice for preliminary injunction in this case got under way, Black & Decker had already sold half of their order. They still have approximately 200,000 in their inventory. It was because of this that Pittway filed with its complaint a motion for a preliminary injunction, and sought an early hearing. Pittway seeks to prevent Black & Decker from selling their remaining inventory.

## DISCUSSION

The law is clear, a plaintiff is entitled to a preliminary injunction in a patent infringement suit when it demonstrates: (1) that there is a reasonable likelihood of success on the merits (reasonable likelihood that the patent is both valid and infringed);

(2) that irreparable injury will result if the injunction is not granted; (3) that the threatened injury to the plaintiff if an injunction is not granted outweighs the threatened harm to the defendant if the injunction is granted; and (4) that the granting of the injunction will not disserve the public interest. *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1269–70 (Fed. Cir.1985); *Smith International Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983).

In deciding whether or not to grant a preliminary injunction, let us consider first whether there is a reasonable likelihood that Pittway can succeed on the merits. In other words, is there a reasonable likelihood that the patent is both infringed and valid? *Roper*, 757 F.2d at 1269–70.

■ Black & Decker has admitted that its product infringes Pittway's '832 patent. Infringement thus having been established, the remaining big question is validity. Because the validity of each of the patent's claims must be separately and independently considered, *Glaros v. H.H. Robertson Co.*, 797 F.2d 1564, 1569–72 (Fed.Cir.1986), Pittway need only show a reasonable likelihood that *one* claim is valid in order for an injunction to be granted.

■ Pittway's '832 patent must be presumed valid because it was duly issued by the United States Patent and Trademark Office. 35 U.S.C. § 282. The effect of this presumption is to shift the burden of proof to the admitted infringer, for "the burden of establishing invalidity remains on the party attacking validity," *Roper*, at 1270; and "the evidence adduced in connection with a motion for preliminary relief must be considered in this light." *H.H. Robertson Co. v. United Steel Deck, Inc., et al.*, 820 F.2d 384, 387 (Fed.Cir.1987). "This burden is *immutable* and does not change because a preliminary rather than permanent injunction is being sought." *Id.* at 5–6, 820 F.2d at 388. (Emphasis added). This statutory presumption of validity goes further. Here it places on Black & Decker the burden of proving invalidity by clear and convincing evidence. *Jones v. Hardy*,

727 F.2d 1524, 1528 (Fed.Cir.1984). "Notwithstanding the fact that the introduction of prior art that may not have been before the examiner may facilitate the challenger's meeting the burden of proof on invalidity, the burden of overcoming the presumption of validity by clear and convincing evidence remains intact and never shifts from the patent challenger throughout the [hearing]." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir.1986).

■ For a patent to be valid, it must be novel under 35 U.S.C. § 102, and non-obvious under 35 U.S.C. § 103. In simple terms, this means, first, that there must be a difference between each prior art reference and the challenged patented device so that the latter would be deemed "new." And secondly, this means that the differences between the subject matter of the challenged patented device and the prior art are such that the subject matter as a whole would not have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter of the invention pertains. *Graham v. John Deere Co.*, 383 U.S. 1, 3–4, 86 S.Ct. 684, 686–87, 15 L.Ed.2d 545 (1966).

## NOVELTY

■ "A device is 'new' if its essence has not been disclosed in a prior art device." *Roberts v. Sears, Roebuck & Co.*, 723 F.2d 1324, 1332 (7th Cir.1983). The applicable statutory provisions, 35 U.S.C. §§ 102(a), (e) and (g), "provide in distilled form that a device lacks novelty if it has been anticipated by a prior patent or publication in this or a foreign country or by prior use, knowledge, or invention in this country." *Id.* at 1332. The Seventh Circuit has also stated that "anticipation is strictly a technical defense ... unless all of the same elements [of the sought-to-be-patented device] are found [in a single prior art device] in exactly the same situation and united in the same way to perform an identical function, [the former is not anticipated by the latter.]" *Illinois Tool Works, Inc. v. Sweetheart Plastics, Inc.*, 436 F.2d 1180, 1182–83

(7th Cir.1971). *See also Roberts.* at 1332. This Circuit has also stated, however, that "when the only features distinguishing the purported invention from a prior art product are insubstantial, the earlier may properly be said to anticipate the latter product." *Shelco, Inc. v. Dow Chemical Co.,* 466 F.2d 613, 614–15 (7th Cir.), *cert. denied,* 409 U.S. 876, 93 S.Ct. 125, 34 L.Ed.2d 129 (1972). Thus for this court, "the test [is] one of substantial identity; [but] it is sufficient if the general prospects are the same and the difference in minor matters is only such as would suggest itself to one of ordinary skill in the art." *Amphenol Corp. v. General Time Corp.,* 397 F.2d 431, 438 (7th Cir.1968).

"Substantial identity is determined by reference to the language of the patent claims, which define the ambit of the claimed invention." *Roberts,* 723 F.2d at 1333. "Thus, the determination whether a patented device has been anticipated by a prior art reference requires a two-step analysis: (1) the identity of the patented device, as well as its scope, must be determined by the claims submitted to and allowed by the Patent Office; and (2) the patented device, as so defined, must be compared with each prior [art] reference." *Id.*

In this case, when the prior art references that were cited by the examiner were compared to Pittway's '832 patent, there was no finding of substantial identity; meaning that as far as the Patent Office is concerned, the '832 patent had not been anticipated by any prior art. The defendants, Black & Decker, came up with two uncited prior art references (not cited by the examiner), namely a Hubner Patent (# 3,027,507) and a Moyer Patent (# 4,076,-458). Black & Decker claims that these two uncited prior art references are more pertinent than any cited by the Patent Examiner to the '832 patent in suit; but when these two uncited prior art references are compared to the '832 patent, I find that there is no substantial identity. The '832 patent provides a fundamental difference in construction and operation by the use of a circuit board which none of the prior art references, cited or uncited, contains. Pitt-

way's '832 patent has not been anticipated by either of the two uncited prior art references cited by Black & Decker or by any of the cited prior references. These differences in construction and operation preclude a finding of anticipation, and therefore, the '832 patent fulfills the novelty requirement.

The defendant contends, however, that Pittway's '832 patent is anticipated piecemeal by a combination of the Van Dyke, Hubner and Moyer patents and asserts that the various individual elements of the '832 patent are old. It is true that there is nothing novel over the prior art about the three-position switch; recessed prongs which can be made to protrude; a common casing for the recharging unit and battery; but there is a well-established rule of law that "a novel combination of elements, whether all new or all old, or partly old, which so cooperate as to produce a new and useful result or a substantial increase in efficiency is patentable." *Minneapolis-Honeywell Regulator Co. v. Midwestern Instruments, Inc.,* 298 F.2d 36, 38 (7th Cir.1961). "A patented combination which results in a more facile, economical or efficient unit, or which provides results unachieved by prior art structures, cannot be anticipated piecemeal by a showing that various elements of the invention are old." *Diamond Rubber Co. v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 31 S.Ct. 444, 55 L.Ed. 527 (1911); *O'Brien v. O'Brien,* 202 F.2d 254, 255 (7th Cir.1953). Although many of the elements found in the '832 patent are old, they are combined to produce a new and more efficient and useful product for the consumer, therefore, making Pittway's invention novel. Pittway's "First Alert Rechargeable Flashlight" is more efficient and useful because it can be held, operated and recharged by using only one hand. Also, when the elements of the Van Dyke, Hubner, and Moyer are combined, there is still no circuit board used in the construction and operation of any one of them; therefore, the '832 patent is not anticipated by a combination of the prior art cited by the examiner along with that

cited by Black & Decker even when they are combined.

## OBVIOUSNESS

■ The issue here is whether the differences between the subject matter of the '832 patent and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103. The ultimate question of obviousness is one of law. It is to be determined after several factual inquiries have been made. The U.S. Supreme Court stated that:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined.

*Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

"One can readily see that the factual inquiries necessary to the determination of anticipation (i.e. the scope and content of the prior art and differences between each prior art reference and the claims of the patent in suit) also compose part of the tripartite factual inquiry upon which the determination of obviousness must rest." *Roberts*, 723 F.2d at 1334. "The anticipation inquiry, itself largely factual in nature, *Hughes Tool Co. v. Ingersoll Rand Co.*, 437 F.2d 1106, 1108 (5th Cir.), *cert. denied*, 403 U.S. 918, 91 S.Ct. 2230, 29 L.Ed.2d 696 (1971), is subsumed within the obviousness inquiry." *Roberts*, at 1334. "Under the obviousness test, however, an additional factual inquiry is to be made: the level of ordinary skill in the pertinent art must be determined." *Id.*

"The usual way of determining 'the level of ordinary skill' in a particular art is by referring to the subjective reaction of a person thoroughy familiar with the particular art and, if possible, one who practiced the art at the crucial time in question." *Malsbary Manufacturing Company v.*

*Ald, Inc.*, 447 F.2d 809, 811 (7th Cir.1971); *see Paper Converting Machine Co. v. Magna Graphic Corp.*, 680 F.2d 483, 496 (7th Cir.1982).

The law gives the court the responsibility of determining the obviousness or nonobviousness of a challenged device. Naturally the court does not have the time nor expertise to go through all the pertinent prior art and determine whether the device is obvious or nonobvious. Determining whether the invention is obvious or not depends upon the court's having been taught by experts, who are to be relied upon for their opinions based upon their knowledge and experience in that particular art. In turn, their opinion, on whether or not the invention would be obvious to a person of ordinary skill in that particular art, would depend upon: (1) the expert, himself, being a person possessing ordinary skill in that particular art; or (2) being an expert who is well aware of and acquainted with the knowledge and observations of a person possessing ordinary skill in that particular art; or (3) a combination of the two. When it becomes the duty of the judge to act upon an expert's advice, he must determine the reliability of the expert from his own background and from the clarity of his explanations. When it comes to choosing between two experts, which is often the case, the court must weigh them as it would any other witnesses considering the quantity and quality of their testimony and all of those other factors which bear upon the credibility of the witnesses.

Here we have two experts, one on each side. One who says the invention is obvious to a person of ordinary skill in this particular art, and one who says the invention is not obvious to a person of ordinary skill in the particular art. One of the experts purports to speak from the perspective of a person having ordinary skill in this particular art, and one speaks from the perspective of having measured the relative skills of others having ordinary skill in this particular art directly or indirectly. The court thus has two experts before it, one who has admitted that he is not a

person of ordinary skill in this particular art but claims to know what one of ordinary skill would say. And then there is the other who purports to have ordinary skill in this particular art as well as to know what persons of ordinary skill in this particular art would say.

The defendant's expert would be weighed by the following qualifications: (1) patent attorney for 26 years; (2) degree in chemical engineering at the University of Wisconsin; (3) a period of service as the United States Commissioner of Patents; and (4) a period of service as a member of the Presidential Commission on the Patent System. The plaintiff's expert would be weighed by the following qualifications: (1) patent liaison of the Sunbeam Corporation; (2) assistant patent counsel of the Sunbeam Corporation; (3) patent counsel for the Sunbeam Corporation on a worldwide basis from 1954–1983; (4) one-time Chairman of the ABA Patent, Trademark and Copyright Law section; and (5) a member and/or officer on several international patent and trademark associations.

While both experts have outstanding credentials, it seems that the plaintiff's expert is better suited to make a judgment as to whether the invention, Pittway's "First Alert Rechargeable Flashlight," was obvious to a person of ordinary skill in that particular art at the time of the filing of the patent application. The plaintiff's expert was patent counsel for a corporation that had patented and marketed many rechargeable devices in the past. Based upon his testimony, it seems that he is very familiar with rechargeable devices and this would qualify him as a person who would know what one of ordinary skill in that particular art would say. The defendant's expert, albeit outstanding credentials in the patent field, lacks expertise with rechargeable devices. He also admits to his not being a person of ordinary skill in this particular art. Thus it seems that he is not necessarily qualified to make a judgment as to whether the plaintiff's invention was obvious to a person of ordinary skill in this particular art. The court is justified in coming to the conclusion that plaintiff's invention is not obvious to a person of

ordinary skill in this particular art. In weighing the testimony of both experts, one concludes that Black & Decker has not demonstrated the invalidity (lack of novelty and obviousness) of claims 15–21 by clear and convincing evidence, and that the plaintiffs have shown a reasonable likelihood of success on the merits, fulfilling thereby the first requirement for the granting of a preliminary injunction in a patent infringement suit.

The second responsibility of the plaintiff is to demonstrate that irreparable injury will result if the injunction is not granted. *Roper*, 757 F.2d at 1269–70.

■ Irreparable injuries are those that are impossible to measure in monetrary terms. *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed.Cir.1985). While monetary relief is often the sole remedy for past infringement, it does not follow that a money award is also the remedy against future infringement. *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1233 (Fed.Cir.1985). The patent law further provides injunctive relief in order to preserve the legal interest of the parties against future infringement which may have market effects never fully compensable in money. *Id.* If monetary relief were the sole relief afforded by the patent statute, then injunctions would be unnecessary and infringers could become compulsory licensees for as long a time as the litigation lasts. *Id.*

■ Black & Decker argues that Pittway's alleged damages may be hard to quantify but that they are nonetheless quantifiable in monetary terms and therefore not irreparable. According to the testimony Pittway lost over 30% of its market share during the months immediately following Black & Decker's introduction of its infringing copies of Pittway's First Alert Rechargeable Flashlight. Many retailers had been handling Pittway's First Alert Rechargeable Flashlights exclusively, but after Black & Decker introduced its infringing FlashLiter models, these same retailers began carrying Black & Decker's FlashLiter product as well. This resulted

in loss of shelf space for Pittway's products. Currently some of Pittway's customers are planning to stop carrying Pittway's line of Flashlights altogether and switching to Black & Decker's flashlight products. Some of the retailers who had exclusively promoted Pittway's First Alert Rechargeable Flashlights, have now began advertising Black & Decker's FlashLiter product. The injury caused by Pittway's loss of shelf space and loss of the benefit of the advertising it had purchased has decreased Pittway's exposure in the marketplace and its ability to sell both its patented three-position switch flashlights and its other, non-patented products. In addition, Black & Decker's FlashLiter products have preempted the opportunity for Pittway to enhance further the good will and reputation symbolized by its patented switch and First Alert Rechargeable Flashlights. Permitting Black & Decker to continue selling its FlashLiter product will encourage others to copy Pittway's invention and flood the market with infringing products without fear of being stopped by a prompt injunction. In sum, the defendant's infringing acts have significantly damaged Pittway's market exposure and penetration, market share, exclusivity, commercial reputation, good will and sales of both its First Alter Rechargeable Flashlights and its other products as well.

According to the evidence, the trade name "Black & Decker" is admittedly one of the most if not the most widely recognized names in the hardware and appliances field. Its gross income, according to the testimony, exceed $1.5 billion per year. The early marriage of the Black & Decker name to the plaintiff's patented rechargeable flashlight would give the defendant, within a short period of time, an irreversible command of the market. The potential injury naturally resists ordinary measurement. Some of the injury to the plaintiff may be compensable, but there will be market effects that could never be measurable in monetary terms. It is apparent that irreparable injury would result if the injunction relief is not permitted.

The next requirement is that plaintiff must demonstrate that the threatened hardship and injury to the plaintiff if an injunction is not granted outweighs the threatened hardship and injury to the defendant if the injunction is granted. *Roper*, 757 F.2d at 1269.

When comparing the injuries to the parties if the injunction were to issue, Black & Decker doubtless would be faced with a disruption in its daily relationships with its regular customers and a resulting loss of credibility. The only other harm it would suffer is that it would be prevented from liquidating its inventory. Both of these injuries can be repaired. Both of these injuries would have been prevented had Black and Decker refrained from copying Pittway's flashlight. In effect, they are self-inflicted. The injury to Black & Decker from not being able to sell its remaining inventory would be vastly reduced because many of the parts from these flashlights can be used in its newly designed non-infringing "Two Switch" Rechargeable Flashlight.

The traditional and last requirement is that the plaintiff must demonstrate that the granting of the injunction will not disserve the public interest. *Roper*, 757 F.2d at 1269. "In determining whether to issue preliminary injunctive relief in a patent case, the court should take into account, where relevant, the possibility of harm to other interested persons from a grant or a denial of injunction, *together with the public interest*." *Eli Lilly and Co. v. Premco Pharmaceutical Labs*, 630 F.2d 120, 136 (3rd Cir.), *cert. denied*, 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980); *see Smith Intern, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1579 (Fed.Cir.1983).

"The patent law must be interpreted in the light of the constitution and of its purpose declared by the Supreme Court, to reward individual and not group achievement." *Potts v. Coe*, 140 F.2d 470, 478 (D.C.Cir.1944). "Applications for patents must be measured against the basic requirement," *Torok v. Watson*, 122 F.Supp. 788, 790 (D.C.1954), "... to promote the progress of science and useful arts, by

securing for limited time to authors and inventors the exclusive rights to their respective writings and discoveries." U.S. Const., Art. I, Sec. 8, cl. 8.

■ "The public policy of promoting the progress of the useful arts is achieved by granting a limited monopoly to an inventor who fully discloses his invention to the public in a United States Patent," *Congoleum Industries, Inc. v. Armstrong Cork Co.*, 366 F.Supp. 220, 227 (E.D.P.A.1973), and "the economic philosophy behind the Constitution[al provision] is the conviction (of our Founders) that encouragement of individual effort by personal gain, ... is the best way to advance the public welfare ..." *Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954). "In order to effectuate that end, Congress 'granted valuable, enforceable rights to ... [inventors] ... without burdensome requirements,' *Washingtonian Publishing Co. v. Pearson*, 306 U.S. 30, 36, 59 S.Ct. 397, 400, 83 L.Ed. 470 (1939), among which is the right to sue for infringement." *Boz Scaggs Music v. KND Corp.*, 491 F.Supp. 908, 912 (D.Conn.1980). This is why in patent cases protection usually requires immediate injunctive relief. The question of whether the preliminary injunction will serve the public welfare is assured in the fundamentals which underlay this constitutional provision. Generally, it may be said protecting patents from would-be infringers is always acting in the public interest.

### CONCLUSION

Because the plaintiff has demonstrated: (1) a reasonable likelihood of success on the merits; (2) that irreparable injury will result if the injunction is not granted; (3) that the threatened injury to the plaintiff if the injunction is not granted will outweigh the threatened harm to the defendant if the injunction is granted; and (4) that the granting of the injunction will not disserve the public interest; the petition for a preliminary injunction is allowed. I suggest that this matter, should Pittway request it under Rule 65, be consolidated with the case in chief and set down for a final

evidentiary hearing on the issue of damages.