Scott H. YENZER and Haverfield Corporation (A Florida Corporation), Plaintiffs,

v.

AGROTORS, INC. (A Pennsylvania Corporation), Defendant.

Civ. A. No. 3:CV–90–1950.

United States District Court, M.D. Pennsylvania.

April 23, 1991.

976

Joseph G. Ferguson, Rosenn, Jenkins & Greenwald, Wilkes Barre, Pa., Vincent P. Kovalick, Laurence R. Hefter, Finnegan, Henderson, Farabow, Garrett & Dunner, Robert J. Gaybrick, Washington, D.C., for plaintiffs.

Charles J. Long, York, Pa., Daniel W. Sixbey, Martin M. Zoltick, Stuart J. Friedman, Sixbey, Friedman, Leedom & Ferguson, McLean, Va., for defendant.

## MEMORANDUM

RAMBO, District Judge.

Plaintiffs Scott Yenzer and Haverfield Corporation have filed a motion for a preliminary injunction to prevent defendant Agrotors, Inc. from allegedly infringing on a patent owned by Yenzer and licensed to Haverfield. The motion has been exhaustively briefed, and on April 4, 1991 a hearing, which took the form of oral argument, was held on the issues presented by the motion.

*Background*

In late 1983 through mid–1984, plaintiff Yenzer began to experiment with a device and technique for servicing and maintaining high voltage power transmission lines by helicopter. The relevant portions of his invention included a metal, laterally extending platform which was attached to the helicopter's skid tubes.[1] On one side of the platform, a workman sits with his back to the cabin door and legs dangling over the side. From this vantage point he inspects or works on the lines. The other end of the platform has equipment to balance out the weight. Yenzer's servicing technique for energized power lines consists of the helicopter hovering a few feet from the high voltage line and the workman, sitting on the platform in an electrically conductive suit, making an electrical connection from the line to the platform, suit, and helicopter so that the entire system becomes energized to the voltage of the power line.[2] The workman then performs whatever maintenance is necessary.

Prior to the use of helicopters in maintaining and repairing these power lines, power companies were forced to rely on slow and often cumbersome techniques. Some methods are designed for use on a live line, using insulated tools and ladders to perform repairs or using the "bare hand" technique where the lineman electrically couples himself to the line and becomes energized himself, with some form of insulation preventing an electrical connection with the ground. Other servicing would be performed with the lines deenergized, which could at the least require serious planning to find alternate transmission routes and at most could result in the disruption of customer service.

Most live line servicing had been performed using insulated bucket trucks, in which the workman would stand in the insulated bucket and perform the necessary work. Use of a truck, however, has natural limitations. It cannot set up on water or other impassable terrain, nor can it set up under planted farm land or envi-

---

1. The "landing gear" of the helicopter.

2. Evidently, this flow of electrical current through man and helicopter is not deadly because there is no ground leading to the helicopter, and little chance of the helicopter becoming grounded because it is hovering in the air.

ronmentally sensitive areas without damaging the crops or the natural land below.

Another technique for working on live lines is the use of a cart which is attached to the power lines and rolls along the lines until it reaches position. The lineman then works from the cart to repair the lines. This can be a time consuming process, however, for each time the cart reaches an obstacle on the line like a spacer or insulator, the cart must be detached and reattached.

On October 4, 1984, Yenzer applied for a patent for his apparatus and technique. Just over two years later, on January 20, 1987, he was granted United States Patent number 4,637,575 (the "'575 patent"). Sometime in September 1990, plaintiffs first became aware that defendant Agrotors, a well established company which performs various helicopter services including crop spraying and the like, had developed a system which looked suspiciously like the one Yenzer had patented. Like the Yenzer patent, the Agrotors design included a laterally extended platform on which a workman would sit, energized to the potential of the line along with the helicopter, and work on the high voltage lines. Unlike the Yenzer device, however, Agrotors platform was not made of metal (or any other electrically conductive material) or connected by separate wires to the fuselage of the helicopter. In addition, the Agrotors platform was fastened directly to the fuselage, not the skid tubes like the Yenzer version.

In November 1990, Yenzer and Haverfield filed an action for infringement of the '575 patent and for deceptive and unfair trade practices. Agrotors filed an answer and asserted a counterclaim for the declaration of the invalidity, noninfringement and unenforceability of the '575 patent. In March 1990, plaintiffs filed this motion for a preliminary injunction.

*Discussion*

■ In patent cases, a court may issue a preliminary injunction where:

1) The patentee has a reasonable likelihood of success on the merits;

2) the patentee will be irreparably harmed if the injunction does not issue;

3) the threatened injury to the patentee outweighs the threatened harm the injunction may cause the alleged infringer; and

4) the granting of the preliminary injunction will be in the public interest.

*Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1269 (Fed.Cir.1985). Courts in general have recognized that where there is a reasonable likelihood that a patent is being infringed, there may be a special need for injunctive relief to stem any damage done to a plaintiff. *See Augat, Inc. v. John Mezzalingua Assocs., Inc.*, 642 F.Supp. 506, 508 (N.D.N.Y.1986) ("Unlike the more usual case in which courts inquire into whether money damages will adequately compensate an injured plaintiff, patents are afforded special protection."); *Pittway v. Black & Decker Corp.*, 667 F.Supp. 585, 593 (N.D.Ill.1987) ("in patent cases protection usually requires immediate injunctive relief").

I. Reasonable Likelihood of Success on the Merits

■ To determine whether plaintiff has a reasonable likelihood success on the merits, the court must be satisfied that plaintiff will win on both the issues of the validity and the infringement of his patent. *See Hybritech, Inc. v. Abbott Laboratories*, 849 F.2d 1446, 1451 (Fed.Cir.1988).

A. *Validity of the Patent*

■ Patents are born valid. The burden of proving a patent or a claim within a patent invalid is on the person asserting the invalidity. *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270 (Fed.Cir. 1985). The challenger must demonstrate invalidity by clear and convincing evidence. *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 446 (Fed.Cir. 1986), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). In a preliminary injunction setting, the burden is arrayed as follows: plaintiffs must show by a preponderance of evidence that defendant will fail to meet its burden of proving the invalidity

of the patent by clear and convincing evidence. *E.I. du Pont de Nemours Co. v. Polaroid Graphics Imaging Co.*, 706 F.Supp. 1135, 1140 (D.Del.1989), *aff'd mem.*, 887 F.2d 1095 (Fed.Cir.1989).

As a launching point, this court looks to just what portions of plaintiff's patent are at issue here. Plaintiffs assert that two claims from the patent have been infringed by Agrotors. Claim 23, the process claim, attempts to protect: 1) a method for working on high voltage power lines; 2) in which a workman is attached to a laterally extending platform; 3) and the platform is electrically connected to the fuselage; 4) the helicopter then hovers adjacent to the power line; 5) a workman, in an electrically conductive suit, is electrically connected with the power line and the platform; 6) then the helicopter, suit, and platform are all brought to the same electric potential as the line.

Claim 21, the apparatus claim, sets its borders around: 1) a work platform and helicopter assembly for working on high voltage power line; 2) fastened to a helicopter's skid tubes; 3) the platform is longer than the distance between the two skid tubes; 4) the platform extends laterally between and across the skid tubes; 5) there is an electrical conducting means which connect the platform with the fuselage; 6) and an electrically conductive wand which electrically connects the platform with the power cable; 7) the wand includes a coupling means for releasably coupling the cable as well as a hand grip on the opposite end.

■ Defendant here argues that the patent is invalid because it would have been obvious to those of ordinary skill in the art

of the invention, a defense outlined in 35 U.S.C. § 103. Section 103 states:

> A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

To ascertain whether a claimed invention is obvious or not, one must determine the scope and content of the prior art, contrast the prior art to the claim at issue, and decide what level of skill in the pertinent art is involved. *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1966).

Three prior patents form the relevant prior art here: 1) Patent No. 4,673,059 issued to Michael Kurtgis on June 16, 1987 (the " '059 patent")[3]; 2) patent no. 3,904,155 issued to Gene Chavis on September 9, 1975 (the " '155 patent"); and 3) patent no. 4,477,289 issued to Kurtgis on October 16, 1984 (the " '289 patent").[4]

The '059 patent sets out an apparatus and procedure for suspending a lineman on or in the vicinity of an energized power line system. In its most relevant form, the patent discloses a workman suspended from a helicopter by a line without insulating links. When they reach the target line, which is energized, the lineman attaches himself, energizing the entire system, helicopter and all, to the potential of the power line. The lineman then detaches himself and works on the power line.

The '155 patent involves a step and cargo carrier assembly attached to the helicopter skid tube longways.[5]

---

**3.** Though officially filed after Yenzer's application, this patent was originally applied for in December 1982 and abandoned. Thus it is eligible for consideration as part of the prior art to Yenzer's patent.

**4.** Plaintiff also cites to a number of promotional brochures of Utilities Services of America (USAI), Kurtgis' company, which appear to utilize a technique employing two of the '155 type platforms to work on live lines. The court will not consider these as part of the prior art, as there is no indication of when they were pub-

lished and, in fact, secondary evidence exists showing that USAI did not intentionally energize a helicopter and workman until 1988, long after Yenzer had submitted his patent application. Therefore, the evidence would suggest that these promotional materials were published after Yenzer's application.

**5.** The '155 patent was considered by the patent examiner during the patent application and approval process.

The '289 patent envisions an apparatus and process where a team in a helicopter use a platform (much like the one in the '155 patent) and a conductive spray boom to clean insulators. At the end of the boom is a nozzle which directs a pressurized spray while the helicopter hovers close to the tower. In the event that the boom becomes energized, the entire helicopter and boom can "sustain being energized by contact with the electrified transmission line or its components" as they become energized to the same potential as the power line. United States Patent No. 4,477,289 at Col. 5, lines 55–58.

■ Comparing these prior revelations to the present patent, the court does not believe that the prior art would have made the '575 patent obvious to a person skilled in the art of electrical fields and currents. Taken together, the three patents show that a helicopter and lineman in a conductive suit may be energized to allow him to work on a live line; that a platform may be fixed longitudinally on a skid tube for use as a step or cargo carrier; and that a helicopter may be flown reasonably close to the energized portions of power lines.[6] However, what is telling is what is not demonstrated by these patents. None have or use a laterally extending platform on which a worker actually sits to service power lines. None discloses a workman in a conductive suit, a platform, and a helicopter energized to the same potential as a power line for the purpose of servicing such a line.[7] None discloses a procedure where a helicopter hovers directly adjacent—within feet—of the power lines.

■ Importantly, secondary factors weigh heavily in favor of not finding

the '575 patent obvious. The consideration of secondary factors is crucial to the determination of obviousness, *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540 (Fed.Cir.1984), and, in fact, it would be error on the part of the court to exclude evidence of these factors. *Simmons Fastener Corp. v. Illinois Tool Works, Inc.*, 739 F.2d 1573, 1575 (Fed.Cir.1984), *cert. denied*, 471 U.S. 1065, 105 S.Ct. 2138, 85 L.Ed.2d 496 (1985); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed.Cir. 1983). A nexus must be established between the secondary considerations and the merits for the factors to be given significant weight. *Stratoflex*, 713 F.2d at 1539.

Here, the court is content that the secondary factors listed below are highly relevant to the viability of Yenzer's patent. First, the '575 patent as put to use appears to have answered a long-felt but unsolved need in the industry, outlining a successful live line servicing strategy where others had failed. It has provided the power industry with a fast, efficient and safe method for servicing nearly inaccessible high voltage lines which could only be reached previously by much more cumbersome and time-consuming means. Moreover, the technique of the '059 patent, suspending a lineman from a helicopter then letting him disengage, would appear to be less time efficient and more dangerous than the '575 method, where the workman is attached to a stable platform in full view of the pilot and is able to move him from spot to spot with ease. Tellingly, Yenzer's invention also has evidently saved a number of power companies millions of dollars, and quite a few sing the praises of Haverfield and its work. *See* Affidavit of Richard Brainard

---

**6.** The '289 patent requires that the boom be longer than the helicopter's rotors. '289 Patent at Col. 8, lines 11–12.

**7.** Indeed, it appears that the only purpose of allowing the helicopter and boom to be energized in the '289 patent is in case the boom should accidently come in contact with a hot area. *See* '289 Patent at Col. 5, lines 55–58. Normally the apparatus would not and should not be energized. Additionally, the value of this patent to one skilled in the art for application to servicing the lines is diminished because the sole purpose of the apparatus and technique

described in the '289 patent is to clean insulators with a jet spray. '289 Patent at col. 8, lines 40–60 (Claim 1). Kurtgis himself did not energize a lineman and helicopter purposely until 1988. Trial Transcript, *Utilities Services of America, Inc. v. Florida Power and Light*, No. 84–32250 (Dade County, Fla. Jan. 25, 1988) at 706. In contrast, the entire purpose of the 557 patent is for the helicopter, platform, and electrically conductive suit to become energized so that the lineman may use the barehand method in repairing the lines.

at ¶¶ 13–15; Articles attached as Plaintiff's Exhibit D.

Yenzer also proceeded contrary to the accepted wisdom of the prior art by hovering the helicopter within feet of the energized high voltage lines, in contrast to the teachings of the '059 patent, where the helicopter hovers well above the lines, and the '289 patent, where the helicopter hovers reasonably close to the lines, but nevertheless employs a boom and spray nozzle to keep a safe distance between the helicopter and the surfaces to be cleaned. *See In re Hedges,* 783 F.2d 1038, 1041 (Fed.Cir.1986) (proceeding contrary to conventional wisdom is "strong evidence" of non-obviousness).

Plaintiffs have also enjoyed considerable commercial success based on the patented technique and apparatus. Before Yenzer began his line servicing venture, Haverfield Corporation grossed $100,000 per year; for the fiscal year ending March 31, 1991, Haverfield expected gross revenues of $7,000,000. *See Simmons Fastener,* 739 F.2d at 1576.

Last, there is at least a reasonable inference that Agrotors adopted the design of the '575 patent rather than that of any prior art devices. *See infra* at 980–983. The designer of the Agrotors device and technique admitted in a deposition that he was aware of Haverfield's laterally-extending platform design while at work on the Agrotors process, Deposition Transcript of Daryl Ed at 61, and adopted the look and general theory of use of the Haverfield system instead of a design involving a horizontal platform suggested by the '155 patent or the suspension technique of the '059 patent. *See Panduit Corp. v. Dennison Mfg. Co.,* 774 F.2d 1082, 1099 (Fed.Cir. 1986), *vacated on other grounds,* 475 U.S. 809, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986).

Based on this analysis of relevant primary and secondary indicia of obviousness, the court is thus satisfied that the '575 patent was not obvious as compared to the prior art. Plaintiffs have therefore sustained their burden of showing that defendants could not, by clear and convincing evidence, prove that the apparatus and technique described in the '575 patent are invalid.

### B. *Infringement of the Patent*

 Literal infringement of a patent is present when each limitation of a claim is found in the allegedly infringing device or method. *Mannesmann Demag Corp. v. Engineering Metal Prods. Co.,* 793 F.2d 1279, 1282 (Fed.Cir.1986). Each claim should be analyzed individually. *W.L. Gore & Assocs. v. Garlock, Inc.,* 721 F.2d 1540, 1559 (Fed.Cir.1983), *cert. denied,* 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984). If a claim is not literally infringed all is not lost for the patentee, though, as the doctrine of equivalents permits a patentee protection against an alleged infringer who makes small changes in the design but lifts the core of the patented idea. The test for finding infringement under the doctrine of equivalents is whether the allegedly infringing product performs substantially the same function in substantially the same way to achieve substantially the same result. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). The purpose of this equitable doctrine is to prevent an infringer from enjoying the benefits of an invention by making a few modifications so that the usurping device or product does not literally infringe the patent. *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 805 F.2d 1558 (Fed.Cir.1986).

The burden here is on the plaintiffs to convince the court that they have a reasonable likelihood of success of showing that the patent is being infringed. *Roper Corp. v. Litton Systems, Inc.,* 757 F.2d 1266, 1271 (Fed.Cir.1985).

#### 1. Claim 23

Plaintiffs argue that Claim 23 of the '575 patent is literally infringed by the Agrotors device and method, and that even if it is not, then Agrotors is still an infringer on that claim as an equitable matter under the doctrine of equivalents. With regard to Claim 23, the court sees two main problem areas in finding literal infringement. The first is with the limitation that the platform

needs to be "electrically connected" to the helicopter fuselage. The platform in the '575 patent is connected to the helicopter by separate cables. The Agrotors platform is connected to the fuselage via aluminum support members. Plaintiff argues that these aluminum support members perform the same function as the conductive cables, that is, they "electrically connect" the platform to the fuselage. Defendant counters that one schooled in the art would interpret the connector language as requiring a separate electrical line, and that simply having conductive supports is not sufficient.

■ The second problem area relates to the limitation that the platform be electrically connected with the helicopter fuselage so that the power line, the electrically conductive suit (worn by the workman), the work platform and the helicopter fuselage be brought up to the same electric potential. Defendant responds that, as stated above, there are no separate cable connectors present in the Agrotors device, and that since the Agrotors platform is made of a non-conductive material, fiberglass, all these components cannot possibly be brought up to the same potential.

Plaintiff, however, offers the deposition of Professor Markus Zahn, a professor at the Massachusetts Institute of Technology and an expert in electrical engineering.[8] Zahn posits that the aluminum supports do provide a means of electrical connection, although the current flow is smaller than it would be through a separate cable. Affidavit of Professor Markus Zahn at ¶ 12 (hereinafter Zahn Affidavit). Moreover, the *IEEE Standard Dictionary of Electrical and Electronics Terms* at page 307 defines the term "electrically connected" as "[c]onnected by means of a conducting path or through a capacitor, as distinguished from connection merely through electromagnetic induction." This definition would appear to encompass the aluminum supports as well as separate conducting cables.

Moreover, the Agrotors practice electrically couples a lineman in a conductive suit to a power line and then connects the suit by cable to a central ground in the helicopter fuselage. Professor Zahn opines that when the power line is connected to the center ground of the helicopter, all the necessary components in the Agrotors design, including the platform (through the aluminum supports) and the conductive suit, are energized to the same potential if the current is direct (DC). If it is an alternating current line, then the portions of the work platform connected to the fuselage and in contact with the suit will be energized to the potential of the line; those other portions will be very close to the potential of the line. Zahn Affidavit at ¶¶ 12–17. According to Zahn, the fiberglass platform, though not made of a conductive material, will be brought to the same potential as the other components after a somewhat longer time period than if it were made of conductive material. *Id.* at ¶ 14.

Defendant fires back with the affidavit of George McDuffie, a professor of electrical engineering at the Catholic University of America.[9] Professor McDuffie opines that based on his experience one having ordinary skill in the art would interpret the "electrically connecting" language of Claims 21 and 23 as requiring a connector

---

**8.** Zahn claims four degrees in electrical engineering from the MIT including a masters of science and a doctor of science. He is presently an associate professor of electrical engineering at MIT, but had been on the faculty of the University of Florida for ten years, including two years as a full professor. His principal fields of emphasis are electromagnetic field theory, high voltage engineering, dielectric physics and electrodynamics. His *curriculum vitae* boasts authorship of a textbook on electromagnetic field theory and scores of articles, as well as numerous professional awards.

**9.** Professor McDuffie has bachelors and masters degrees from Catholic, and a doctor of philosophy degree in electrical engineering from the University of Maryland. He has been on the faculty at Catholic since 1963, and served as dean of the School of Engineering and Architecture for a period. He is a licensed professional engineer, and has testified previously in other patent matters. Professor McDuffie is also the author of over 20 published journal articles.

separate from those supporting the platform.

The court notes that Professor McDuffie's opinion does not really dispute the claims made in Zahn's affidavit, but instead puts forth the opinion that one skilled in the art would interpret the patent requirements in a certain way. The court, based on Zahn's position that the platform does receive a current through the supports, and that all the components of the Agrotors combination become energized upon hook up to the high voltage line, concludes that the language of the claim 23 is broad enough to cover the Agrotors system.

Defendant is not defeated yet, though. It also argues that even if there is a current carried by the supports within the meaning of the terms in the claim, Yenzer is prevented from claiming infringement under the doctrine of "file wrapper estoppel," where "the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir.1985). Agrotors contends that Yenzer "admitted" that a contact such as the aluminum support structure is not sufficient to secure the proper electrical connection, citing Yenzer's published patent at column 5, lines 30–33. This portion of the declaration states:

> [I]n order to work on high voltage lines, it is necessary that a perfect electrical connection exist between the work platform, the skid tubes, the skid supports and the helicopter fuselage. In order to ensure that such electrical connection is made and maintained, separate electrical connectors, preferably formed of a wire gauge sufficient to handle the voltage, are provided for connection between the work platform and the fuselage.

Agrotors, defendant argues, is now practicing what plaintiff Yenzer stated previously was not practical or safe.

Plaintiffs rightly point out, however, that the disclosure of separate electrical connectors in the application was meant to satisfy the "best mode" requirement of the patent statute, 35 U.S.C. § 112, ¶ 1, so that the public will have available the best way of putting the claimed invention to use. At column 3, lines 7 and 8, the same patent states that the following description is "a preferred embodiment." Further, at column 6, lines 21–25, the patent states:

> The above [detailed description of the invention] describes a specific and preferred embodiment of the present invention. It should be appreciated that the scope of this invention is not limited to that described above, but solely with reference to the following claims.

Limitations in the specifications outlining the preferred mode of use should not be read into the language of the claims themselves. *Sjolund v. Musland*, 847 F.2d 1573 (Fed.Cir.1988) (discussing *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107 (Fed.Cir.1985)). For the purpose of determining infringement, the court must compare the alleged infringing device or methods with the claims and not with its embodiment in the market. *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476 (Fed. Cir.1984), *cert. denied*, 469 U.S. 924, 105 S.Ct. 306, 83 L.Ed.2d 240 (1984). Therefore, the court does not believe that file wrapper estoppel prevents plaintiffs from claiming that the aluminum supports are electrically connected to the fuselage as required in Claim 23.

The court is satisfied that plaintiffs, through their expert, have established by a preponderance of the evidence, a reasonable likelihood of success on the merits in showing the literal infringement of Claim 23.

### 2. Claim 21

Plaintiffs rely only on the doctrine of equivalents to press their claim that Agrotors' platform assembly infringes Claim 21 of the '575 patent, as there are some obvious differences between the two which would preclude a finding of literal infringement.

Here, there are three problem areas between the limitations of Claim 21 and the

Agrotors device as practiced: 1) the '575 work platform is to be made of electrically conductive material, while the Agrotors platform is made of fiberglass; 2) the '575 platform is to be attached to the skid tubes, but the Agrotors platform is secured directly to the fuselage; 3) the wand of the '575 claim is to have a "cable coupling means for releasably coupling a cable," while the Agrotors apparatus has no readily discernable coupling device on its wand.

■ With regard to the material used in the platform, the court, as evidenced by the discussion in the previous section, is satisfied that the Agrotors platform is within the scope of protection afforded Yenzer under the doctrine of equivalents, as the platform does become, according to plaintiff's expert, energized to the potential of the line, and it does support a lineman so that he can work directly on a power line.

The attachment means of the platform also creates a problem for Agrotors under the equitable doctrine. Though the Agrotors platform is secured directly to the fuselage, it rests a few inches above the skid tube, essentially in the same position as the platform in Claim 21. This means that the platform allows for a lineman to work on high voltage lines, including energized lines, while attached to it. The Agrotors attachment means thus meet all three of the *Graver Tank* criteria.

The cable coupling means of the Agrotors combination too performs substantially the same function in substantially the same way to achieve substantially the same result as the means described in Claim 21. The tip of the Agrotors wand, which is straight "releasably couples" with the line as the initial step in energizing the helicopter and platform. While not a physical "coupling," this electrical coupling is done for the same purpose and for the same effect as the hooked wand in the '575 scheme.

■ In applying the doctrine of equivalents, the court must also look to whether the prior art would encompass the allegedly infringing structure as part of that in the public domain. Here, the court is satisfied that there is nothing in the prior art,

which was discussed extensively in the section of this memorandum dealing with the validity of the patent, which would have prevented Yenzer from making a claim which would have directly encompassed the Agrotors design. The similarities between the two combinations are legion, and the differences—the platform material, etc.—are nothing which the prior art would have made obvious.

In addition, the court must consider for Claim 21 whether file wrapper estoppel will prevent plaintiffs from claiming that Agrotors violates the scope of equivalents. Defendant points out that during the prosecution of the patent, a statement was made (now disavowed by plaintiffs) that the '155 patent was distinguishable from the proposed '575 patent because it was made of an electrically non-conductive material—fiberglass—and thus could not be used in the manner suggested by Yenzer's application. This statement, argues defendant, now precludes Yenzer from claiming that the platform may be made of conductive material to the same effect.

■ In applying file wrapper estoppel, the representations at issue must be made to induce the grant of protection to a claim. *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985). *See also Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1284 (Fed.Cir.1986). Here, plaintiffs assert, and defendant does not deny, that the representation about the make up of the platform was made after Claim 21 had been approved in light of the '155 patent. Thus, there was no inducement involved, and the statements to the patent examiner will not invoke the estoppel.

Based on the foregoing analysis, the court is satisfied that Claim 21 is infringed by Agrotors helicopter-platform assembly under the doctrine of equivalents.

II. Irreparable Harm

■ Irreparable harm will be presumed in a patent infringement action where validity and infringement have been *clearly established*. *Roper Corp. v. Litton Sys-*

*tems, Inc.*, 757 F.2d 1266, 1271 (Fed.Cir. 1985). Here, the court believes that although plaintiffs have shown a reasonable likelihood that the '575 patent will not be proved invalid and that defendant has infringed that patent, they have not been able to demonstrate this by the high "clear evidence standard." The court's fourteen pages of wrangling with the merits in the discussion above is demonstrative of the difficulty of the issues presented here.

■ Thus, the court must delve into a traditional analysis of irreparable harm. *Roper Corp.*, 757 F.2d at 1272. Here, the court is satisfied that plaintiffs will suffer real and irreparable injury should Agrotors be permitted to proceed with its use of the apparently infringing device and technique. First, Haverfield has presented evidence that Agrotors intends to use its platform assembly to perform service and maintenance work on high voltage lines. *See* Ed Deposition at 35; Affidavit of Jerry Matlick. Indeed, Agrotors has evidently bid on one maintenance contract and come in the low bidder.[10]

Second, Haverfield's market share could be severely damaged by Agrotors use of the allegedly infringing apparatus and technique. While, if the Agrotors system was found to be infringing on the merits the market share for maintenance contracts would return to the status quo in less than a year, plaintiffs have shown that the maintenance business is closely tied to other power line services such as inspection, which Agrotors now performs. *See* Brainard Affidavit at ¶ 16; Ed Deposition at 100–01; 108–09. Contracts for one type of service are often procured on the basis

of contract for another type of service. Therefore, it would seems that Agrotors would become that much stronger of a competitor, with an enhanced ability to place its rotor in the door of potential customers, for the how ever many months before a final disposition of this matter on the merits. This is a factor whose effects could be felt years down the line, and would not be easily compensable by damages.

Last, if Agrotors is not enjoined, it could result in additional infringements of the '575 patent by other competitors. *See Pittway v. Black & Decker*, 667 F.Supp. 585, 592 (N.D.Ill.1987). Moreover, such an action by the court may encourage disrespect for patents in general. *See Augat, Inc. v. John Mezzalingua Assocs., Inc.*, 642 F.Supp. 506, 508 (N.D.N.Y.1986) ("unlike the more usual case in which the courts inquire into whether money damages will adequately compensate an injured plaintiff, patents are afforded special protection.").

The court is satisfied that plaintiffs will suffer the type of irreparable harm deserving of this type of extraordinary injunctive relief.

### III. Balance of Equities

■ The court concludes that the equities balance in favor of plaintiffs. Plaintiffs have presented evidence that 100 percent of its profits and 75 percent of its revenues are derived from the '575 patent technology. Yenzer Affidavit at ¶ 25. By its own admission, Agrotors' venture into the maintenance field is now still in its incipiency. Further, Agrotors is a far more diversified company than Haverfield, with revenue derived from agricultural spraying and other endeavors. Granting the injunction will thus do defendant little

---

10. Agrotors states that this bid is of no consequence because the contract involved an deenergized line. However, Agrotors points out the job involves work on an overhead static wire, a wire suspended above the current carrying wires to protect against lightning strikes. The specifications of the job require that the circuit

be deenergized if proper live line clearances cannot be maintained. If the circuit remains energized, the helicopter must couple to the static line because the line will contain induced electric potential from the live wires. If deenergized, the helicopter must couple with the static

injury, while failure to grant such relief could do plaintiff a substantial amount of harm as discussed in the above section.

## IV. Public Interest

█ It goes without saying that the public interest is served by the protection of valid patents. It encourages invention and innovation by protecting the inventor's rights, and disseminates valuable information to the public so that these innovations may be improved and built upon. *See Pittway Corp.*, 667 F.Supp. at 593; *see also Mazer v. Stein*, 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954). Moreover, the court can see no third party or public good that will suffer as a result of granting the injunction. Therefore, the court is convinced that the public interest will be helped and not harmed by the granting of a preliminary injunction in the present matter.

## Conclusion

Accordingly, plaintiffs have shown the requisite elements for the issuance of a preliminary injunction.

line anyway to even out the potentials between the helicopter platform assembly and the static wire. *See* Zahn Supplemental Affidavit. Therefore, the court considers this bid solid evidence of an intent to use the platform assembly to compete with Haverfield.