**ETHICON ENDO–SURGERY, Plaintiff,**

v.

**UNITED STATES SURGICAL CORP., Defendant.**

No. C–1–94–74.

United States District Court,
S.D. Ohio,
Western Division.

June 3, 1994.

**1503**

Robert Alexander Pitcairn, Jr., Katz, Teller, Brant & Hild Co., Cincinnati, OH, for plaintiff.

Daniel Jerome Buckley, Vorys, Sater, Seymour & Pease, Cincinnati, OH, for U.S. Surgical Corp.

### ORDER DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

SPIEGEL, District Judge.

This matter is before the Court on Plaintiff, Ethicon Endo–Surgery's Motion For a Preliminary Injunction (doc. 2) to which the Defendant, United States Surgical Corp. has responded (doc. 11), the Plaintiff has twice replied (docs. 15 & 22) and the Defendant has provided a Surreply Response (doc. 26).

On March 21 and 22, 1994, the Court held a Hearing on the Plaintiff's motion. Final arguments were heard on April 4, 1994. In rendering our decision of this matter, we have considered the testimony of the witnesses, the documents admitted into evidence, the Plaintiff's proposed findings of fact and conclusions of law (doc. 24, 37), and the Defendant's proposed findings of fact and conclusions of law (doc. 27, 38), and joint proposed findings of fact and conclusions of law (doc. 42).

In weighing the testimony of the witnesses, we considered each witness' relationship to the Plaintiff or to the Defendant; their interest, if any, in the outcome of the trial; their manner of testifying; their opportunity to observe or acquire knowledge concerning facts about which they testified; and the extent to which they were supported or contradicted by other credible evidence.

This is a dispute concerning surgical linear cutter-staplers. These instrument are used by surgeons to simultaneously cut and staple tissue. In particular the Plaintiff, Ethicon, asserts that the linear cutter-staplers which are marketed by the Defendant, U.S. Surgical, infringe one of the Plaintiff's patents. The patent in question covers a lockout de-

vice. This device prevents a surgeon from inadvertently cutting tissue without having the cutter loaded with staples. The Defendant denies that its product infringes the Plaintiff's patent, and further argues that the balance of equities weighs against the issuance of a preliminary injunction.

Under Fed.R.Civ.P. 52, we set forth our findings of fact and conclusions of law.

## FINDINGS OF FACT

### I. The Parties

1. Plaintiff Ethicon Endo–Surgery ("Ethicon") is a general partnership formed under the laws of the State of New Jersey with its principal place of business in Cincinnati, Ohio. Both the general partners are subsidiaries of Johnson & Johnson, Inc. Ethicon develops, manufactures and sells mechanical wound-management products.

2. Defendant United States Surgical Corporation ("U.S. Surgical") is a Delaware corporation with its principal place of business in Norwalk, Connecticut. U.S. Surgical is doing business in Ohio. U.S. Surgical develops, manufactures and sells mechanical wound-management products.

3. U.S. Surgical began selling mechanical wound-management products before Ethicon. U.S. Surgical first began selling surgical staplers in the late 1960's. The company has devoted significant resources to research and development and has regularly improved its products over the years. In addition U.S. Surgical has sponsored surgical training programs, in which surgeons learn to use their surgical staplers. U.S. Surgical has been a pioneer in the development of endoscopic surgery, a technique for minimally intrusive surgery, which allows speedy recovery and reduces hospital stays. U.S. Surgical was the first to market a linear cutter with a lockout device.

4. Ethicon, though second in the market has become a vigorous competitor of U.S. Surgical. Ethicon is a subsidiary of Johnson & Johnson, Inc. which manufactures among its many products, surgical sutures and other products used in surgery.

5. Together U.S. Surgical and Ethicon account for the entire market for surgical liner cutter-staplers.

### II. The Parties' Patents

#### A. *The Fox Patent.*

6. The earliest embodiment of the patented Fox lockout mechanism was conceived in November 1987.

7. In November 1988, Ethicon filed the application which led to the issuance of the original Fox patent in the names of William D. Fox, Rudolph H. Nobis, Richard P. Nuchols and Mark S. Zeiner.

8. On January 9, 1990, the United States Patent and Trademark Office (the "PTO") issued to Ethicon, Inc. United States Letters Patent No. 4,892,244 (the original "Fox Patent"), for an invention entitled "SURGICAL STAPLER CARTRIDGE LOCKOUT DEVICE." The original Fox patent included claim 6 which is now at issue in this suit.

9. The Fox Patent describes a lockout device "in a staple cartridge."

10. Ethicon has never practiced the Fox Patent commercially.

11. In testing the prototypes of the Fox Patent, Ethicon did not actually test the lockout under actual conditions of surgery.

#### B. *The Tompkins Patents.*

12. The patented Tompkins lockout mechanism was conceived after November 1987, but no later than May/June 1988.

13. In May 1989, U.S. Surgical filed the application which led to the issuance of the first Tompkins patent in the names of Thomas M. Tompkins and Dominic F. Presty.

14. On September 10, 1990, the PTO issued to U.S. Surgical United States Letters Patent No. 4,955,959 (the "Tompkins '959 Patent") for an invention entitled "LOCKING MECHANISM FOR SURGICAL FASTENING APPARATUS."

15. On July 16, 1991, the PTO issued to U.S. Surgical United States Letters Patent No. 5,031,814 (the "Tompkins '814 Patent") upon an application filed in the names of Thomas M. Tompkins and Dominic F. Pres-

ty, for an invention entitled "LOCKING MECHANISM FOR SURGICAL FASTENING APPARATUS."

### III. The Devices At Issue

16. Ethicon and U.S. Surgical each market surgical devices called linear cutters. In fact these parties are in effect the only manufacturers of the type of cutters which are involved in this suit. Linear cutters are used by surgeons to cut body tissue while simultaneously stapling the tissue closed on both sides of the incision in order to prevent excessive bleeding. After each cut, the staples are depleted so the surgeon must reload the cutter to avoid cutting without the benefit of staples. The particular devices which are the subject of this case are mechanisms for preventing the surgeon from accidentally using the device without staples. This is accomplished by a "lockout" safety device which makes it impossible to reuse the cutter without reloading. Both the parties linear cutters have lockout devices and each are covered by patents.

17. There are two general types of linear cutters, designed for different types of surgery. Open linear cutters are used in conventional surgery, in which the surgeon gains access to body organs through large incisions. Endoscopic linear cutters are used in endoscopic surgical procedures, in which the surgeon makes only a small puncture wound and performs the surgery through a tube (a trocar), using elongated instruments, while viewing the affected area by means of a miniature camera, also inserted through a trocar.

### IV. Introduction Of The Devices To The Market

18. U.S. Surgical first introduced its GIA linear cutter/stapler without a lockout mechanism in 1968. In October 1989, U.S. Surgical introduced the first linear cutter with a lockout mechanism (its 60mm cutter). U.S. Surgical introduced its 80mm device with a lockout in early 1990.

19. In August 1991, Ethicon introduced a 75mm open linear cutter with a lockout mechanism. Ethicon introduced a 55mm open cutter with a lockout in December 1991.

20. U.S. Surgical introduced a 30mm endoscopic linear cutter with a lockout mechanism in spring 1991. Ethicon and U.S. Surgical both introduced 60mm endoscopic cutters with lockout mechanisms in fall 1992. Ethicon introduced its 35mm endoscopic cutter in May 1993.

### V. The 1990 Meetings Between Ethicon And U.S. Surgical Concerning The Fox Patent

21. In June 1990, Johnson & Johnson's chief patent counsel, Robert Minier, acting on Ethicon's behalf, sent a letter to U.S. Surgical's General Counsel, Thomas Bremer, stating that U.S. Surgical's linear cutters infringed the original Fox patent.

22. Mr. Minier, and another Johnson & Johnson patent lawyer, Paul Coletti, acting on behalf of Ethicon, then met with Mr. Bremer and with U.S. Surgical's in-house patent counsel, John Andres, twice, first in July, 1990 and then again in September, 1990. During the meetings, U.S. Surgical's counsel asserted that the original Fox patent was not infringed and was invalid in view of certain prior art.

23. The parties did not reach agreement in the course of the two meetings. There were no further communications between the parties about the Fox patent.

### VI. The Fox Reexamination Proceeding

24. In November 1990, Ethicon requested that the PTO reexamine the original Fox patent.

25. In January 1991, the PTO denied the request for reexamination.

26. The PTO reconsidered its denial of the request for reexamination and on March 16, 1991, granted the request and decided to reexamine the Fox patent.

27. On July 2, 1991, the PTO examiner confirmed the patentability of all claims of the original Fox patent and issued his reasons for confirming the patent.

## VII. The Fox Reissue Proceeding

28. 35 U.S.C. § 251 provides for reissuance of a previously issued patent for specified reasons:

"Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent."

29. Ethicon filed an application with the PTO for reissue on December 31, 1991.

30. In making its application for reissue, Ethicon stated that:

The error in connection with claims 4–12 of [Fox's] patent, by which declarants claimed less than they had a right to claim, was determined to exist in connection with reexamination of the subject patent, and examination of a United States Surgical stapler apparatus. In connection with this study, it was realized that the construction of the United States Surgical apparatus, as disclosed in U.S. Patent No. 5,031,814, to Tompkins et. al., incorporated declarants' invention, but such a construction could be asserted as not falling within the scope of claims 4–12 of their patent. (Reissue Application Declaration at 4)

31. In particular, Ethicon stated in its application for reissue:

Claim 6, while more broadly directed to a pusher-bar/lockout mechanism assemblage wherein the lockout mechanism prevents the pusher bars from passing more than one time through the cartridge, can be interpreted as requiring declarants' novel lockout mechanism in the staple cartridge itself, while it is within the purview of defendants' invention to embody their invention in a construction wherein all features of the lockout mechanism are not necessarily incorporated in the staple cartridge. (Reissue Application Declaration at 3–4).

32. Ethicon added claim 24 (then numbered claim 37) to the Fox reissue application on August 13, 1992.

33. The PTO issued the Fox reissue patent on January 25, 1994.

## VIII. The Claims Of The Fox Reissue Patent At Issue

34. Two claims in the Fox Reissue Patent are at issue on this motion. Claim 6 of the Fox Reissue Patent is identical to Claim 6 in the original Fox patent. Claim 6 reads as follows:

"In a staple cartridge insertable within a surgical stapler and containing staples and comprising an elongated body including one or more longitudinal slots for slidably receiving one or more longitudinal pusher bars comprising a firing mechanism of said surgical stapler, and a plurality of drivers engageable by said pusher bars for ejecting the staples from the cartridge, said staple cartridge releasably fastened to a said surgical stapler, the improvement comprising a lockout mechanism connected to said longitudinal slots for preventing said pusher bars from passing more than one time through said longitudinal slots."

35. The other claim at issue is claim 24 which Ethicon added in its the reissue application. Claim 24 reads as follows:

"A surgical stapler comprising:

"a frame, a cartridge filled with staples and positionable in operative association with said frame and having one or more slots,

"a firing assemblage including a pusher assembly movable relative to said frame,

"said pusher assembly comprising one or more pusher bars respectively extending through said slots to fire said staples,

"a member operatively connected to said pusher assembly for moving the pusher assembly in a firing direction down a path to fire the staples, and in a direction opposite to said firing direction to a retracted position after at least a portion of the staples have been fired,

"a lockout mechanism for preventing firing movement of the pusher assembly in the firing direction after the pusher assembly has been moved to the retracted position, "said lockout mechanism including a barrier assemblage for preventing movement of the pusher assembly from said retracted position, "said barrier assemblage comprising a resilient "projecting member normally biased toward a position to engage said pusher assembly to prevent of movement of said pusher assembly relative to said resilient projecting member after said pusher assembly has been moved to said retracted position,

"and a restraining structure separate from said pusher bar for blocking said barrier assemblage to maintain said resilient projecting member out of the path of the pusher assembly during staple firing, "said restraining structure being movable by said pusher assembly during movement of the pusher assembly in the firing [direction] "whereby the barrier assemblage is released to allow the resilient projecting member to move into the path of the pusher assembly to prevent firing movement of said pusher assembly after movement thereof to said retracted position.

## STANDARD FOR PRELIMINARY INJUNCTION

■■■ To obtain a preliminary injunction, pursuant to 35 U.S.C. § 283, a party must establish the right in light of four factors:

(1) reasonable likelihood of success on the merits;

(2) irreparable harm;

(3) the balance of hardships tipping in its favor; and

(4) the impact of the injunction on the public interest.

*Hybritech Inc. v. Abbott Laboratories*, 849 F.2d 1446 (Fed.Cir.1988). The Court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested; no single factor is dispositive. *Id.* at 1451. "It is generally recognized that the grant or denial of a preliminary injunction in a patent case is a matter committed to the sound discretion of the district court." *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573 (Fed. Cir.1983); *see also CSX Transport, Inc. v. Tennessee State Bd. of Equalization*, 964 F.2d 548 (6th Cir.1992).

## DISCUSSION

■■■ The purpose of preliminary injunction is to preserve the *status quo* pending determination on the merits. *Perez–Funez v. District Director, I.N.S.*, 611 F.Supp. 990, 1001 (C.D.Cal.1984). In the patent area, preliminary injunctions often are issued to protect an established patent holder from "knock-offs," that is new intruders into the patent holder's statutory monopoly. *See Yenzer v. Agrotors, Inc.*, 764 F.Supp. 974, 984 (M.D.Penn.1991) (protecting patent holder from incipient competition and "additional infringements ... by other competitors"). In the case at bar the parties have both been selling the cutters in question for some time. In fact U.S. Surgical was the first in the market over four years ago. Both parties have established strong positions in the market place and both are relied upon daily by physicians in sensitive surgical procedures. We are reluctant to use our equitable powers to disrupt rather than maintain the status quo in this highly specialized and sensitive product area.

Furthermore, the "courts have over the years developed a reluctance to resort to preliminary injunctions in patent infringement cases, and have constructed a rather strict standard for the granting of this form of equitable relief." *Smith International*, 718 F.2d at 1578. The standard for granting such relief has been characterized as "unusually stringent." *Id.* Foremost among the requirements for a preliminary injunction is a showing that the moving party has a reasonable likelihood of success when the issues are tried on the merits. *Hybritech Inc.*, 849 F.2d at 1451. Having studied the record before us and having had an opportunity to hear oral arguments at length, we are not convinced of that likelihood. Therefore, we are unwilling under the circumstances of this case to grant "extraordinary" and "drastic" relief. *See Borey v. National Union Fire Ins. Co.*, 934 F.2d 30, 34 (2nd Cir.1991);

*Computer Assoc. Int'l, Inc. v. Bryan,* 784 F.Supp. 982, 986 (E.D.N.Y.1992). As we apply the four criteria for preliminary injunction to the facts of this case, it will be evident that the Plaintiff's arguments, though cogent and well made, do not meet the high standard required for a preliminary injunction.

## A. Likelihood of Success

■ The first element the Plaintiff must establish in order to qualify for a preliminary injunction is that it stands to have a reasonable likelihood of success on the merits when the jury finally adjudicates the dispute. *Hybritech,* 849 F.2d at 1451. A patent holder must establish this likelihood both in regard to validity and to infringement. *Id.*

### (1) *LIKELIHOOD OF SUCCESS: VALIDITY*

■ Pursuant to 35 U.S.C. § 282, a patent is presumed valid and the "burden is on the party asserting invalidity to prove it with facts supported by clear and convincing evidence." *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.,* 796 F.2d 443, 446 (Fed.Cir.1986). Upon reissue the burden of proving invalidity is made heavier due to the repeated examination by the PTO. *Interconnect Planning Corp. v. Feil,* 774 F.2d 1132, 1139 (Fed.Cir.1985). The validity of the patents in question was not given extensive consideration by the parties in their briefs, as the focus of the arguments before us today is whether the Defendant's devices infringe the Fox Reissue Patent. However, U.S. Surgical has raised two challenges to the validity of the Fox Reissue Patent in their briefs.

■ The first challenge to the validity of Fox is qualified. A determination of infringement cannot be made in the abstract, but only in the context of the claimed invention. *Texas Instruments v. United States Int'l Trade Comm'n,* 805 F.2d 1558 (Fed.Cir. 1986) Therefore, the question of validity is dependent on the interpretation and expanse given to the claims. The Defendant maintains that if the claims of the Fox Reissue Patent are held to be as broad as the Plaintiff would urge, then they cannot be justified in terms of the prior art. In other words, the Defendant first argues that the claims of the Fox Patent must be read narrowly, in which case there is no infringement. In the alternative, if the claims of Fox are read broadly, then those claims cannot be justified in light of the prior art. However, since we understand the scope of the Fox Reissue Patent to be more limited, for purposes of this preliminary injunction, we have not undertaken a serious examination of the validity of the Fox Reissue Patent in light of prior art.

■ In addition, the Defendant has argued that its own patent, the Tompkins patent, has priority of invention over the Fox Patents because the device described in the Fox Patents was never actually reduced to practice. It is undisputed that the Plaintiff placed into evidence, prototype models of the claimed devices. However, the Defendant's argument is based on admissions by the Plaintiff that they never actually tested these prototypes on tissue. *See* 35 U.S.C. § 102(g) (priority requires both conception and reduction to practice). Proof of actual reduction to practice requires demonstration that embodiment relied upon as evidence of priority actually worked for its intended purpose. *Newkirk v. Lulejian,* 825 F.2d 1581, 1582 (Fed. Cir.1987) "[R]eduction to practice of a complex mechanical device ... requires that the device was subjected to a test under actual working conditions which demonstrated not that the device might work, but that it actually did work." *Id. quoting Chandler v. Mock,* 150 F.2d 563, 565 (CCPA 1945). Ethicon contends that since the claimed invention is a lockout mechanism, testing on tissue was not necessary to prove its effectiveness. U.S. Surgical responds that since the claims refer to a lockout mechanism on a device which must function in the surgical environment of tissue and bodily fluids, simply making a prototype and literally testing it on paper does not qualify as reduction to practice. It follows that conditions are even more specialized when the surgery is endoscopic. Further factual inquiry would be required to determine the actual extent of the testing conducted and how much would be necessary to prove effectiveness and thus reduce this invention to practice. As noted, the issue of validity was not the main focus of

the arguments before us. However, the Defendant does raise a cognizable issue of actual reduction to practice.

### (2) LIKELIHOOD OF SUCCESS: INFRINGEMENT

 The central thrust of the Plaintiff's arguments for a preliminary injunction is that U.S. Surgical's devices infringe on the Fox Patent as recently reissued. Ethicon claims that the U.S. Surgical open linear cutters infringe directly on claims 6 and 24 of the Fox Reissue Patent. The Plaintiff also claims that the U.S. Surgical endoscopic cutters infringe on claims 6 and 24 under the doctrine of equivalents. There is literal infringement if every limitation of the patent claims is found in the accused device. *Uniroyal Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.1988). However, even when literal infringement is absent, a device can infringe under the doctrine of equivalents when the accused device does "the same work in substantially the same way, and accomplish[es] substantially the same result." *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

#### (a) Claim 6 and the U.S. Surgical Open Linear Cutters

 Ethicon claims that U.S. Surgical's open linear cutters directly infringe on claim 6 of the Fox Reissue Patent. A determination as to whether a patent is literally infringed requires a two-step analysis: (1) determination of the scope of claim; and (2) determination of whether the claim reads on the accused device. *SmithKline Diagnostics, Inc. v. Helena Laboratories Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988).

 First, then we must determine the scope of claim 6. That claim describes a lockout mechanism in a staple cartridge. U.S. Surgical claims the lockout in its open linear cutter is not in the staple cartridge, but rather in the "disposable loading unit," ("DLU") which they contend is distinguishable from Ethicon's staple cartridge. Ethicon insists that the U.S. Surgical's disposable loading unit is actually a staple cartridge. Ethicon makes a very convincing argument that U.S. Surgical's DLU functions in a manner which in common parlance could be characterized as a cartridge. It is intended to be inserted and removed from a larger instrument, much like a cartridge for a VCR or a ball point pen. However, in the context of a patent application, an inventor is his own lexicographer. *United States v. Telectronics, Inc.*, 857 F.2d 778, 781–82 (Fed.Cir.1988). The meaning of any individual term in a claim is defined by the context of the patent itself. The Court must ascertain the meaning of words in a claim by interpreting the words "with regard to the other claims, the specification, and the prosecution history." *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1056 (Fed.Cir.1988). Therefore, our inquiry is not simply whether U.S. Surgical's DLU functions as a cartridge in the ordinary layman's understanding of the term, but rather whether the U.S. Surgical's DLU reads on Ethicon's cartridge as defined in the Fox Reissue Patent.

 We must therefore carefully examine claim 6 which states:

6. In a **staple cartridge** insertable within a surgical stapler and containing staples and **comprising** [1] *an elongated body* including one or more longitudinal slots for slidably receiving one or more longitudinal pusher bars comprising a firing mechanism of said surgical stapler, and [2] *a plurality of drivers* engageable by said pusher bars for ejecting the staples from the cartridge, said staple cartridge releasably fastened to a said [sic] surgical stapler, the improvement comprising [3] *a lockout mechanism* connected to said longitudinal slots for preventing said pusher bars from passing more than one time through said longitudinal slots.

United States Patent No. Re. 34,519 (the "Fox Reissue Patent"), Column 5, Lines 47–58 (emphasis supplied). As our emphasis indicates, the elements of the staple cartridge listed in Claim 6 in addition to the staples themselves are (1) an elongated body, (2) a plurality of drivers and (3) a lockout mechanism. The elongated body is further described as "including one or more longitudinal slots." The slots are designed "for

slidably receiving one or more longitudinal pusher bars" which comprise the "firing mechanism of said surgical stapler." In practice the way the stapler works is that pusher bars are inserted in the longitudinal slots, displacing the drivers, which in turn push the staples through the tissue. The staples then contact an anvil which causes them to bend and seal.

■ The issue as Ethicon frames it is whether U.S. Surgical's DRL is really the Fox Reissue Patent's "cartridge" with additions. If so then the U.S. Surgical lockout device, located in the DLU would be located in the cartridge and would therefore read on the Fox Reissue Patent. U.S. Surgical contends that the cartridge of the Fox Reissue Patent is analogous to the "cartridge assembly" in their device. The cartridge assembly is a part of their DLU which contains the staples, drivers and which receives the pusher bars. U.S. Surgical's cartridge assembly does not contain a lockout mechanism, but rather it is located at the opposite end of the DLU. After our preliminary investigation we find that Ethicon has not proved the likelihood that the two are the same.

■ First, the wording of claim 6 describes the staple cartridge as comprising longitudinal slots for receiving longitudinal pusher bars. These pusher bars are the firing mechanism for engaging the drivers and thus ejecting the staples. This description by our reading depicts the pusher bars as separate entities from the staple cartridge. Ethicon argues that since claim 6 uses the patent term of art "comprising," we should conclude that the staple cartridge is not limited to the elements delineated in the claim. *See Berenter v. Quigg*, 737 F.Supp. 5, 6–7 (D.C.D.C.1988) ("The word 'comprising' means the recited elements are only a part of the device; therefore, the claim is open.") However, the term of art simply indicates that elements not enumerated may be included in the category as "comprised." When elements are specifically described in a claim as separate and distinct, it would be inconsis-

tent to assume that the author intended the one to be included in the other.

■ We find additional evidence of this in the specification of the Fox Reissue Patent. *See Ziggity Systems, Inc. v. Val Watering Systems*, 769 F.Supp. 752, 784 (E.D.Pa.1990) (holding that we can turn to the specifications and drawings in order to aid us in understanding the scope and meaning of the language employed in the claims). The inventor is allowed considerable latitude in the use of terminology, but words must be used in the same way in both the claims and the specification. *United States v. Telectronics, Inc.*, 857 F.2d 778, 781–82 (Fed.Cir.1988). Our limited reading of the meaning of cartridge in the Fox Reissue Patent is reinforced by the language of the specification:

> [A] typical surgical stapler will have an upper jaw, firing means, a lower jaw ... and a staple cartridge which fits within the lower jaw. . . . The firing means will generally comprise a pusher bar or firing wedge. . . . The firing means will also contain a knife which generally will be placed between the firing wedges. . . . When the firing wedge travels through the staple cartridge, and its activating drivers, it will come into contact with a lockout mechanism.

United States Patent No. Re. 34,519 (the "Fox Reissue Patent"), Column 2, Lines 45–54, Column 3, lines 2–5 (reference numbers omitted). Here again the staple cartridge is described as distinct from the pusher bar(s). The pusher bars travel through the staple cartridge. Our initial reading of claim 6 leads us to conclude that in the context of the Fox Reissue Patent the term staple cartridge has a specific meaning and that it does not include the firing means or pusher bar(s).

■ The U.S. Surgical DLU includes all three elements found in the description of a staple cartridge in the Fox Reissue Patent. In addition it contains a number of other elements including pusher bars, cam bar, cam bar retainer thrust knob, and optionally a knife.[1] Ethicon argues that these parts

---

1. The full description as seen in the Tompkins Patent is:

 (a) a stationary carrier;

 (b) a pusher assembly slidably mounted within said stationary carrier, said pusher assembly comprising at least one cam bar, a cam bar

taken together with U.S. Surgical's cartridge assembly (the elongated body containing slots, drivers and staples) should be considered the same as the cartridge in the Fox Reissue Patent. Ethicon claims that the mere addition of parts does not avoid infringement. In support they offer this quotation from the Federal Circuit:

> It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device. For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits or controls what the pencil can write. Neither would infringement be negated simply because the patentee failed to contemplate use of the pencil in that environment.

*A.B. Dick Co. v. Burroughs Corp.,* 713 F.2d 700, 703 (Fed.Cir.1983) (citation omitted). It is equally fundamental that an improvement which incorporates an existing patent does not avoid infringement. *Hoyt v. Horne,* 145 U.S. 302, 309, 12 S.Ct. 922, 924–25, 36 L.Ed. 713 (1892); *Carl Zeiss Stiftung v. Renishaw PLC,* 945 F.2d 1173, 1179 (Fed.Cir.1991). However, in our view the U.S. Surgical DLU constitutes a reconfiguration beyond the scope of the Fox Reissue Patent's cartridge. To borrow from the pencil analogy employed by the Court of Appeals for the Federal Circuit in *A.B. Dick* above, we liken the lockout mechanism to the eraser on a pencil. Both pencils and erasers would be part of the prior art, as are staple cartridges and lockout devices in the case at bar. The improvement would be the inclusion of an eraser on a pencil. Under these circumstances, a larger more complex device which incorporated a pencil with an eraser mounted on the pencil end would infringe. However, a device which contained a pencil and also an eraser mounted elsewhere in the device would not read on the eraser/pencil claim. Since we read claim 6 of the Fox Reissue Patent to be narrowly limited to a lockout mechanism located in a cartridge, and since we read the Tompkins patent to describe a lockout mechanism outside a cartridge, we find no literal infringement. "[T]he absence of even one [claim] element avoids infringement." *Tol–O–Matic v. Proma Produkt-und Marketing,* 945 F.2d 1546, 1552 (Fed.Cir.1991).

Our initial understanding of the meaning of claim 6 is reinforced by the last four lines:

> the improvement comprising a lockout mechanism *connected to said longitudinal slots* for preventing said pusher bars from passing more than one time through said longitudinal slots.

Patent No. Re. 34,519 (Fox Reissue Patent) Column 5, Lines 55–58 (emphasis added). The device practiced by U.S. Surgical does not inhibit the movement of the pusher bars by obstructing the passage of the pusher bars through the longitudinal slots. The U.S. Surgical linear cutters accomplish their lockout when a hooking clip engages a cam bar retainer, a plastic piece mounted at the end of the cam bars, which are analogous to Ethicon's pusher bars. This cam bar retainer attaches to the cam bars and the knife. Thus instead of blocking the forward motion of the cam bars (pusher bars) by blocking the longitudinal slot, the U.S. Surgical lockout device catches the cam bar and knife assembly from the back, by slipping over a notch in the cam bar retainer. The U.S. Surgical lockout is not in the cartridge assembly and it does not obstruct the longitudinal slots.

To be precise, the Fox Reissue Patent does not specifically state that the lockout func-

retainer for mounting the cam bar, said cam bar retainer having a locking notch, a thrust knob attached to the cam bar retainer, and optionally a knife mounted to the cam bar retainer,

(c) a resilient locking clip fixed to the stationary carrier and having a hook, said locking clip being adapted to be resiliently urged from a first position wherein said hook is non-engagable with said locking notch, to a second position wherein said hook is engagable with said locking notch; and

(d) a blocking means adapted to be movable from a location wherein said blocking means holds said locking clip in the non-engagable first position, to a location wherein said blocking means does not hold said locking clip in the non-engeable first position.

United States Patent No. 5,955,959 (the "Tompkins Patent"), Column 5, Lines 42–46, Column 6, Lines 1–19.

tions by blocking the movement of the pusher bars through the longitudinal slots, but rather that the lockout mechanism is "connected to said longitudinal slots." We understand this to mean directly connected to the slots. As we have noted the lockout device in the U.S. Surgical cutter never touches either the longitudinal slots or the pusher bars, but rather attaches to the cam bar retainer. Ethicon argues for a different interpretation of "connected." Ethicon asserts that the U.S. Surgical lockout is connected to its longitudinal slots since one of the walls of its longitudinal slots is defined by a metal sheet which if followed beyond the longitudinal slots will eventually connect with the hooking clip. However, by this logic every piece of a linear stapler is eventually connected to every other piece. In order to give substantive meaning to the assertion in the Fox Patent that the lockout is connected to the longitudinal slots, we must understand this to mean directly connected. Since the longitudinal slots are part of the Fox Patent's cartridge, this reading of the term connected would require that the claimed lockout be part of the cartridge. Therefore, these last four lines of claim 6 reinforce our reading of that entire claim. Claim 6 of the Fox Patent describes a lockout in a staple cartridge, directly connected to the longitudinal slots. The allegedly infringing device of U.S. Surgical is a lockout which is outside the cartridge and which is not connected to the longitudinal slots.

Ethicon argues that the Fox Reissue Patent is a pioneering patent and should be given broad scope. Ethicon has expressed the scope which it would like to claim in this manner:

> Fox is infringed by *Tompkins* even though *Fox* does not expressly describe in its specification the lockout engaging with the precise plastic piece disclosed as part of *Tompkins*. Since claim 6 is a broad, generic claim covering linear cutters with a lockout mechanism that prevent the pusher bars from passing more than one time through, U.S. Surgical may not practice its *Tomkins* patent without infringing the *Fox* patent.

Plaintiff Ethicon's Reply Memorandum, at 24–25, Document 22. Our own reading of claim six is not so broad. There is considerable evidence from the prosecution history of the Fox Reissue Patent to indicate that the PTO shared our interpretation and that Ethicon's pursuit of reissue was based on their own concerns about the limitations of claim 6.

■ In order to understand the scope of the terms used in patent claims the Court can take instruction from the prosecution history, which includes the assertions of the applicant to the PTO and the responses of the PTO. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1056 (Fed.Cir. 1988). The Fox Reissue Patent has an unusually long prosecution history due to the re-examination and reissue proceedings. After the initial issue of the patent with 12 claims, Ethicon notified the Defendant, asserting that the device U.S. Surgical was practicing infringed the Fox Patent. U.S. Surgical responded by disputing the validity of the Fox Patent, citing prior art. Ethicon asked the PTO to re-examine the Fox Patent in light of this prior art. The PTO originally declined to reexamine, but then reconsidered and finally, after reexamination reconfirmed all twelve claims, in a document dated July 7, 1991. This document, cited by both sides says in pertinent part:

> The claims are confirmed because the prior art of record do not disclose or suggest a surgical staple cartridge comprising a lockout mechanism connected to longitudinal slots of the cartridge in the manner set forth in claim 6 wherein the lockout mechanism prevents the pusher bars from passing more than once through the longitudinal slots.
>
> All of the references cited by the patent owner, with the exception of the Poirer reference and Auto Suture booklet, disclose devices having a lockout mechanism that allow its pusher bars to pass more than one time through the longitudinal slots. The devices shown by Poirier and the Auto Suture booklet do not have a lockout mechanism in the cartridge.

Notice of Intent to Issue Reexamination Certificate, United States Patent No. 4,892,244, July 7, 1991, Defendant's Memorandum in

Opposition, Exhibit 14, Document 11. U.S. Surgical looks to the first paragraph quoted and argues that the PTO distinguished the Fox Patent from the prior art solely because the lockout is in the cartridge. Ethicon looks to the second paragraph and argues that this quotation distinguishes its patent solely because the Fox Patent describes a device which prevents the pusher bar from passing more than once through the slots. Our reading is that the PTO distinguished Fox for both reasons. Some of the prior art is distinguished because the lockout is not in a cartridge and some of the prior art is distinguished because it doesn't prevent multiple firing.

If Ethicon believed that claim 6 provided the scope that Ethicon now asserts, it is difficult to understand why it would not have immediately asserted its claims of infringement. Instead Ethicon asked the PTO to reissue the Fox Patent, with expanded claims. To convince the PTO to undertake reissue Ethicon was required to explain the reasons why they were seeking reissue, including the reasons why they believed the existing patent failed to accurately articulate the actual invention. In doing so Ethicon stated:

> Claim 6, while more broadly directed to a pusher bar/lockout mechanism assemblage wherein the lockout mechanism prevents the pusher bars from passing more than one time through the cartridge, can be interpreted as requiring declarants' novel lockout mechanism in the staple cartridge itself, while it is within the purview of declarants' invention to embody their invention in a construction wherein all features of the lockout mechanism are not necessarily incorporated in the staple cartridge. Claims 6, and claims 7, 8, 9, 10, 11, and 12 depending therefrom of their patent, are therefore insufficient in providing a breadth of protection commensurate with declarants' invention.

> \* \* \* \* \* \*

> [I]t was realized [during the re-examination] that the construction of the United States Surgical apparatus, as disclosed in U.S. Patent No. 5,031,814, to Tompkins et al., incorporated declarants' invention, but

such a construction could be asserted as not falling within the scope of claims 4–12 of their patent.

Reissue Application Declaration, Patent No. 4,892,244 at 3–4, Defendant's Memorandum in Opposition, Exhibit 19, Document 11. We see from the Plaintiff's Reissue Application Declaration that Ethicon at least recognized the limitations of claim 6 which we have documented above.

The PTO eventually issued the Fox Reissue Patent on January 25, 1994, containing claim 6 and additional new claims which we will examine below. In the process the PTO rejected claim 1 of the original Fox Patent. The PTO rejected claim 1 as being indefinite, for failing to particularly point out and distinctly claim the subject matter of the invention. Specifically, they stated that, "Claim 1 implies that the lockout mechanism is not part of the cartridge."

Ethicon asserts that the Fox invention is of pioneering significance and deserves a very broad reading. Essentially they assert that the invention described in claim six is any lockout device which prevents the passage of the pusher bars more than once through a cartridge. But our own analysis of the language of claim 6 leading to a narrower reading is reinforced by early statements made by the PTO. Ethicon articulated these very limitations in justification of their request for reissue. Ethicon stated its concern that claim 6 might be construed to allow a lockout device such as that employed in the Tompkins Patent, where all features of the lockout were not necessarily incorporated in the staple cartridge. The PTO responded by approving claim 6 but eliminating claim 1, because it "implies that the lockout mechanism is not part of the cartridge."

### (b) *Claim 24 and the U.S. Surgical Open Linear Cutters*

In reissuing Fox the PTO also allowed some new claims. It is to new claim 24 that we must now turn our attention. However, initially we must recognize that new claim 24 must be understood in light of the other claims and the entire file history of the Fox

invention. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1056 (Fed.Cir. 1988) (holding that in order to understand patent claims the Court can take instruction from the other claims, the specification and the prosecution history). As noted, simultaneous with the issue of claim 24, the PTO also excluded claim 1, because it did not describe a lockout mechanism in a cartridge. This, in conjunction with the other evidence from the prosecution history which we have already noted mitigates against reading this new claim as significantly expanding the scope of the Fox Reissue Patent.

In addition, the terms used in claim 24 must be understood in light of the patent as a whole. In this respect claim 24, along with the other new claims of the Fox Reissue Patent, is particularly confusing. Claim 24 introduces a whole new vocabulary which is not found in the original Fox patent. Significant among the new terms are "firing assemblage," where we originally saw "firing means" and "firing knob;" "pusher assembly," where we once saw "pusher bar" or "firing wedge;" and introducing "barrier assemblage," "resilient projecting member," and "restraining structure."

Just as the interpretation of claim 6 turned largely on the scope given to the term "cartridge," the interpretation of claim 24 turns largely on the scope given to the term "pusher assembly." Since "pusher assembly" is not used in the original Fox Patent, this creates a particularly difficult job for anyone trying to construe claim 24. In a nutshell, claim 24 describes a lockout device which consists of a "resilient projecting member" which "move[s] into the path of the pusher assembly to prevent firing movement of said pusher assembly after movement thereof to said retracted position." Patent No. Re. 34,-519 (Fox Reissue Patent), Column 10, Lines 1–3.

If pusher assembly is interpreted broadly, as Ethicon urges, then it could be understood to be analogous to both U.S. Surgical's cam bars and cam bar retainer. Under this interpretation the U.S. Surgical cutters could be seen as infringing the Fox Reissue Patent because U.S. Surgical's lockout functions by snapping over a notch in the cam bar retainer, or in the path of the cam bar retainer's forward movement.

U.S. Surgical insists that the new term "pusher assembly" is simply a synonym for "pusher bars." In that case there would be no infringement, because the U.S. Surgical lockout does not move into the path of the pusher bars, but rather attaches to the plastic device which holds the pusher bars, which U.S. Surgical calls the cam bar retainer. U.S. Surgical points out that in the specification of the Fox Reissue Patent, which is unchanged upon reissue, the elements in question are called collectively the "firing means." Specifically included in the firing means are the pusher bars, a knife, and a firing knob.

Parsing the convoluted language of claim 24, it defines a surgical stapler comprising three parts: (1) a frame, (2) a cartridge and (3) a firing assembly. The firing assembly also comprises three parts: (1) a pusher assembly, (2) a member for moving the pusher assembly and (3) a lockout mechanism. It should be noted that this division implies that the lockout mechanism is in the firing assembly and not in the cartridge. How the PTO integrated this with its stated reason for denying claim one, because it "implies that the lockout mechanism is not part of the cartridge" remains uncertain.

However, to continue, claim 24 states that the firing assembly includes (1) a lockout mechanism, (2) a pusher assembly, and (3) "a member operatively connected to said pusher assembly for moving the pusher assembly in a firing direction." The key to interpreting this claim is to decide whether the U.S. Surgical cam bar retainer is analogous to the pusher assembly. U.S. Surgical argues that the new term pusher assembly is a synonym for pusher bars. They point out that the claim states "said pusher assembly comprising one or more pusher bars." Ethicon counters that "comprising" creates an open list and that the pusher assembly includes not only the pusher bars but also what U.S. Surgical calls the cam bar retainer.

It is virtually impossible to resolve this dilemma on purely linguistic grounds. The ambiguity makes either the reading

urged by the Plaintiff or by the Defendant possible. However, to accept Ethicon's interpretation we must believe that the PTO, in reissuing the Fox Patent, intended to significantly expand the scope of that patent. Furthermore, we cannot find on the basis of such ambiguous language that the Plaintiff has met its burden of likelihood of success in asserting this claim.

### (c) *Claim 6 and 24 and the U.S. Surgical Endoscopic Cutters*

■ Ethicon argues that U.S. Surgical's endoscopic cutters infringe on claims 6 and 24 of the Fox Reissue Patent under the doctrine of equivalence. The doctrine of equivalents prevents a copyist from evading patent claims with insubstantial changes. *Valmont Indus., Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1042 (Fed.Cir.1993). Under this doctrine the Supreme Court refused to allow a copyist "to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, will be enough to take the copied matter outside the claim." *Graver Tank & Mfg. v. Linde Air Prod. Co.*, 339 U.S. 605, 607, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

■ In its endoscopic cutters U.S. Surgical uses a lockout mechanism which differs substantially from the one in its linear cutters. The lockout on the Endo–GIA 30 & Endo–GIA differ only slightly from each other. Essentially, they prevent refiring not by obstructing the pusher bars from being reinserted into the longitudinal slots, but rather by leaving the pusher bars in the forward position. This is accomplished by causing the pusher bars and the knife blade to separate from the apparatus that drives the pusher bars forward. In addition rather than restraining the driver apparatus by a resilient spring type device, the driver itself is resilient and the retaining device is fixed. However, we need not enter into a detailed comparison of these devices to the Fox Reissue Patent. U.S. Surgical open linear cutters have a much stronger resemblance to the device described in the Fox Reissue Patent, than those in U.S. Surgical's endoscopic cutters. We can infer, then, that Ethicon has an even less likelihood of succeeding on its infringement claim on these devices than on the open linear cutters which we have considered at length above.

### B. Irreparable Harm

■ In regard to the second factor to be weighed in determining whether a preliminary injunction is appropriate, courts have in some circumstances presumed irreparable harm in patent cases. However, this presumption requires a strong showing of both patent validity and infringement. *Chrysler Motors v. Auto Body Panels of Ohio*, 908 F.2d 951, 954 (Fed.Cir.1990). Since the record in this case does not reflect the requisite strong showing, the Plaintiff cannot rely upon this presumption. Ethicon, however, has offered other substantive arguments on this point.

Ethicon argues that money damages will not be sufficient to adequately compensate it for its losses if we fail to award injunctive relief. Ethicon and U.S. Surgical are the sole competitors in the open and endoscopic linear cutter markets. Therefore, Ethicon argues that "every sale of a U.S. Surgical linear cutter means one less sale of the Ethicon linear cutter and thus directly diminishes Ethicon's market share." Plaintiff's Memorandum in Support of Plaintiff's Motion, at 42, Document 3. However, from the vantage point of the Court, the simplicity of this market makes the award of damages less complicated. Ethicon's lost sales can be easily calculated, if necessary, as a function of U.S. Surgical's actual sales.

A much more persuasive argument presented by Ethicon is the "pull through" theory. Ethicon argues that the cutters at issue in this suit are advanced top-of-the-line products and are among the most important components of their respective product lines. Sales of these important devices undoubtedly effect the sales of other related surgical instruments. Hospitals and surgeons may well choose to purchase an array of related instruments from the company from which they buy their surgical cutters. This would probably occur despite the fact that even the endoscopic instruments are essentially interchangeable. It would be difficult to calculate

monetary damages under those circumstances.

Another persuasive argument presented by Ethicon is that if it were able to exclude U.S. Surgical instruments with lockout devices, Ethicon would be able gain a significant advantage in the area of medical education. They point out that many doctors are now learning the process of endoscopic surgery, and to be able to dominate the market as these surgeons learn the technique would be extremely valuable.

A final argument offered by Ethicon is that if it is to have the advantage of its patent, then its right to exclude must not be delayed. Ethicon asserts that in an age when technological advances occur rapidly, it is only a matter of time until U.S. Surgical or some other competitor designs around their patent and thereby radically reduces its value. However, this argument would be much more persuasive if Ethicon had not been so slow in asserting its patent claims.

 Initially, although the Fox Patent issued in January of 1990 at which time U.S. Surgical already had its open linear stapler with a lockout on the market, Ethicon did not communicate its challenge to U.S. Surgical until June, 1990. When U.S. Surgical disputed the validity of Ethicon's claims and refused to negotiate, Ethicon did not seek legal remedies. Instead, Ethicon requested a re-examination. When re-examination was denied, Ethicon still did not act. Subsequently the PTO conducted its *sua sponte* re-examination. At that point, the PTO had affirmed and reaffirmed on re-examination all of the original claims including claim 6. However, unsatisfied with its original claims, Ethicon sought reissue. Therefore, at the time of reissue, claim 6, upon which Ethicon relies in large part in this proceeding, was four years old. The need for the extraordinary remedy of preliminary injunction is inconsistent with a significant delay in asserting one's claims. *Nutrition 21 v. Untied States*, 930 F.2d 867, 872 (Fed.Cir.1991) (holding that "delay[ ] for a substantial period of time before seeking a preliminary injunction at least suggests that the *status quo* does not irreparably damage [the plaintiff]").

 Delay in asserting patent rights is not an absolute bar to a preliminary injunction. As the Federal Circuit stated in *Hybritech:*

> The period of delay exercised by a party prior to seeking a preliminary injunction in a case involving intellectual property is but one factor to be considered by a district court in its analysis of irreparable harm. Although a showing of delay may be significant, in the districts court's discretion, as to preclude a determination of irreparable harm, a showing of delay does not preclude, *as a matter of law*, a determination of irreparable harm. A period of delay is but one circumstance that the district court must consider in the context of the totality of the circumstances.

*Hybritech*, 849 F.2d at 1457 (footnotes omitted, emphasis in the original). In this case the delay, as it weaves into the revelations concerning the interpretation of claim 6 in the prosecution history, is certainly a factor militating against the issuance of a preliminary injunction.

### C. The Balance of Hardships

 The third factor the Court must consider in determining whether to award a preliminary injunction is the balance of the hardships. "The district court must balance the harm that will occur to the moving party from the denial of the preliminary injunction with the harm that the non-moving party will incur if the injunction is granted." *Id.* A preliminary injunction is particularly appropriate for protecting an established patent from upstarts and knock-offs. However, in the this case the parties each have substantial market share and are vigorously competing. As noted above the cutters at issue are top-of-the-line products. Sale of these cutters amounts to a substantial portion of U.S. Surgical's sales. A preliminary injunction could severely impact U.S. Surgical's sales. As the Plaintiff's point out, U.S. Surgical has experienced some recent financial reversals, including corporate restructuring, and renegotiation of loans.

On the other side of the equation, the immediate impact upon Ethicon is not nearly as drastic. Ethicon would continue to com-

pete vigorously in the market place. "[I]f a preliminary injunction would have a more severe impact on the enjoined party than the moving party would suffer if not granted, that can be a basis for denying the injunction." *American Cyanamid Co. v. U.S. Surgical Corp.*, 833 F.Supp. 92, 133 (D.Conn. 1992). Issuance of a preliminary injunction now would inflict significant harm on the Defendant. In this case the *status quo* is best maintained by the denial of a preliminary injunction.

### D. Impact of Injunction on the Public Interest

■■■ The fourth factor that must be considered in determining whether to issue a preliminary injunction is the impact of that injunction on the public interest. The founding fathers recognized that all of society benefits from the fostering of invention which results from the protection of the inventors rights. *See* U.S. Const. art. I, § 9, cl. 8. However, in the context of a preliminary injunction for patent infringement, the focus of the district court's public interest analysis should be "whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech*, 849 F.2d at 1458. The devices in controversy in this case are surgical instruments which are used continuously in operations of a most serious nature. The Court heard testimony that after years of completion in the marketplace, the medical community preferred the U.S. Surgical open linear cutters by a margin of two to one, and its endoscopic cutters by an even greater margin. Although the relative merits of the two competing lines of cutters is disputed, unquestionably a large number of surgeons are familiar with and have been trained to use the U.S. Surgical cutters. To suddenly withdraw these devices from the market could have a serious disruptive effect on surgical practice. We agree with Judge Cabranes who stated concerning these two parties in a prior dispute over a related surgical device:

> While "public policy favors protection of the rights secured by the valid patents," the court already found that defendant is not likely to prove at trial that its "rights secured by the valid patent" are being infringed by plaintiffs' trocar. Under these circumstances, the public interest is in the continuing competition between the parties.

*Ethicon v. U.S. Surgical Corp.*, 762 F.Supp. 480, 509 (D.Conn.1991). In the case at bar the Plaintiff likewise has failed to make a strong showing of likelihood of success. Therefore, the public's interest in completion and continued access to the Defendant's products tips the balance away from the issuance of an injunction.

### CONCLUSION

To summarize:

(1) Ethicon deserves the presumption that the Fox Reissue Patent is valid, however, there is a question as to whether sufficient testing was carried on to reduce the invention to practice.

(2) Ethicon has not demonstrated a likelihood of proving at trial that the U.S. Surgical cutters infringe the Fox Reissue Patent.

(3) Ethicon has failed to show that it will be irreparably harmed unless a preliminary injunction is issued.

(4) Ethicon has not shown that the balance of hardships tips the scales in its favor.

(5) Ethicon has not shown that this injunction would be in the public interest.

Accordingly, Plaintiff's Motion for a Preliminary injunction is DENIED.

SO ORDERED.